Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA  94618
Telephone: (510) 601-1309
Email:  craigabrandt@att.net

Attorney for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>MIDWEST COMPOSITE TECHNOLOGIES, LLC, a Wisconsin state limited liability company, dba FATHOM., a California business, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby

brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the

Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

### INTRODUCTION

1.          This action is a citizen suit for injunctive relief, declaratory relief, civil penalties,

and remediation against Defendants for current and ongoing violations of the National Pollutant

Discharge Elimination System ("NPDES") permit requirements of the CWA.

COMPLAINT – Page 1

2.       On or about September 8, 2020, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the Agent for Service of Process Rachael Stevens for Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM ("FATHOM"), by certified mail, at 620 3rd. Street, Oakland, California ("the Facility"); and on or about November 12, 2020, EDEN provided Notice of the violations to FATHOM by certified mail to FATHOM'S foreign state agent for service of process CT Corporation System, 818 W. 7th Street, #930, Los Angeles, California, and on or about November 17, 2020, to Midwest Composite Technologies, LLC, Chief Financial Officer, Brian Freeburg, 1050 Walnut Ridge Drive, Hartland, Wisconsin, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.       A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A" and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").)

4.       More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.      The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

7.      By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

8.      Venue is proper because Defendants conduct business in the state in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

**PARTIES**

9.      Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018.  EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

10.     EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.   Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress from environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

11.     EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

12.     EDEN has members throughout California.  Some of EDEN's members reside and work near the San Francisco Bay (the "Receiving Waters" for Defendant FATHOM'S Facility storm water run-off), and use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

13.     EDEN has standing as an association to bring this suit against Defendants, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendants' violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced such harm since at least the date that EDEN provided to Defendants a 60-day Notice of Intent to Sue.

14.     Specifically, the individual member(s) who are experiencing harm from Defendants' violations of the CWA are reluctant to utilize the Receiving Waters downstream

from the Facility as specified in Paragraph 10, above, due to the pollution caused by Defendants' environmental violations that EDEN's members believe has entered into the Facility's Receiving Waters; and the aesthetic and recreational interests of these members has been adversely impacted.

15.     Defendants' ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

16.     EDEN is informed and believes, and on such information and belief alleges, that Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, located at 1050 Walnut Ridge Drive, Hartland, Wisconsin, was formed on or about February 1, 1984 as a Wisconsin state limited liability company.  EDEN is informed and believes that MIDWEST COMPOSITE TECHNOLOGIES, LLC, subsequently acquired FATHOM and according to the Regional Water Board's records, the Facility does not have an Industrial General Permit.

17.     EDEN is informed and believes, and on such information and belief alleges that Defendant Rachel Stevens is the Agent for Service of Process for the Facility according to the documents on file with the Secretary of State.

18.     EDEN is informed and believes, and on such information and belief alleges that Brain Freeburg is the Chief Financial Officer for Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC.

**STATUTORY BACKGROUND**

19.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

20.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

21.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

22.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

    General Permit

23.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April

17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

24.      In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

25.      The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

26.      Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27.      In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not

obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

28. Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

29. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X(B).

30. Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I (1).

31. Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory

set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

32.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

33.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X(H)(4), (5).

34.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

35.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

36.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting

year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

37.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI(B)(2)

38.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit Section XI(B)(4)

39.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, Section XI(A)

40.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, Section XV.

41.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI(B)(6)(c).

42.     The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented

the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

43.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

44.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

45.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit Section XII(A)

46.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section XII(C)

47.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the

exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit Section XII(D)

48.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

49.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

50.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See* also Clean Water Act section 309(c)(4)

<u>San Francisco Bay Regional Basin Plan</u>

51.     The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended

by Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

52.     The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water, recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

53.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

54.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

55.     The Basin Plan sets forth, among other things, narrative WQS for floating material, O&G, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and hydrocarbons ("PAHs"). *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

56.     The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan,

Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California.

57.        Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI(A) of the General Permit.

### Citizen Suit Provision of the CWA

58.        Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

59.        In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

60.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

61.     Defendant FATHOM is an establishment that is primarily engaged in the manufacturing of plastic and metal products and, according to the San Francisco Regional Water Quality Control Board, the Facility falls within the standard industrial classification ("SIC") Codes 3089.

62.     EDEN is informed and believes that Defendant FATHOM is a business that primarily engages in manufacturing and machining of precision plastic and metal parts employing computer controls and machine tools (3D Printing and injecting molding), to remove layers of material from stock pieces to produce custom-designed machine parts. EDEN is informed and believes that Defendant FATHOM uses several different types of materials in its manufacturing processes, including stainless steel, cooper, brass, aluminum, titanium, foam, polypropylene, acrylonitrile butadiene styrene ("ABS"), polyacetal ("POM"), Polycarbonates ("PC") and Nylon.

63.     EDEN is informed and believes that the Facility falls under SIC code 3089 – Plastic Products, Not Otherwise Classified and SIC code 3499 – Fabricated Metal Products, Not Elsewhere Classified.

64.     EDEN is informed and believes that FATHOM'S industrial exhaust ventilation system emits plastic and metal dust, particulates, and fibers from the Facility's manufacturing processes. EDEN is informed and believes that said polluted material collects on the roof of the Facility and that during rain storms washes down Facility's downspouts and into the municipal

street wherein the contaminated material travels into the City of Oakland's municipal storm water conveyance system which then leads into the San Francisco Bay

65.        EDEN is informed and believes that based on its investigation, including a review of the Regional Water Board's records, aerial photography storm water is collected and discharged from the Facility that discharge from at least one outfall.  The outfall discharges storm water and pollutants contained in that storm water directly into the San Francisco Bay, a navigable Water of the United States.

66.        On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

<u>Failure to Apply for NPDES Coverage Under the General Permit</u>

67.        EDEN is informed and believes that Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM began its operations at the Facility on or about October 27, 2008.

68.        Defendant's SIC codes requires it to obtain NPDES coverage under the General Permit.

69.        EDEN is informed and believes, and thereupon alleges that on or about October 27, 2008 to the present, Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM, operated its Facility without obtaining NPDES coverage under the General Permit. EDEN is further informed and believes, and thereupon alleges that Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM was discharging storm water into the

San Francisco Bay without an NPDES permit and had failed to take action to prevent or minimize such discharges, in violation of the CWA.

Non-Existent SWPPP and Site Map

70.     On information and belief, Plaintiff alleges that since at least the beginning of the Facility's operations, Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM has failed to develop a SWPPP and a Site Map for the Facility.

71.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the San Francisco Bay, including the pollutants of pH affected substances, Total Suspended Solids ("TSS") and Oil & Grease ("O&G").

Monitoring and Reporting

72.     On information and belief, EDEN alleges that Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM does not have a storm water monitoring program at its Facility since at least the beginning of the Facility's operations, as required by the General Permit.

73.     On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

74.     Information available to EDEN indicates that as a result of these practices, storm

water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to Collect and Analyze Storm Water Samples</u>

75.        The Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM is required to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples for the second half of the reporting year.

76.        On information and belief, Eden alleges that Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM failed to collect and analyze any storm water samples at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

77.        Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to File Annual Reports</u>

78.        EDEN is informed and believes that Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM has failed to comply with Section XVI(A) of the General Permit, which provides that Dischargers shall certify and submit by way of SMARTS an Annual Report no later than July 15th following each reporting year.

79.        The Annual Report shall include a Compliance Checklist that indicates whether the Discharger has addressed all the General Permit requirements; an explanation for any non-compliance with the General Permit requirements, and an identification of all revisions made to the SWPPP within the reporting year.

80.        On information and belief, Eden alleges that Defendant has failed to file any

Annual Reports since at least the beginning of the Facility's operations, as required by the General Permit.

81.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Implement BAT/BCT and BMPs

82.     EDEN is informed and believes that Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM has failed, since at least the beginning of the Facility's operations, to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit Sections I(C), V(A).

83.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Train Employees

84.     The General Permit requires all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

85.     Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC, dba FATHOM'S failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to comply with required storm water sampling and analysis procedures.

86.     On information and belief, Eden alleges that Defendant MIDWEST COMPOSITE TECHNOLOGIES dba FATHOM failed to appoint a Pollution Prevention Team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

87.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

88.     Information available to Plaintiff indicates that Defendant MIDWEST COMPOSITE TECHNOLOGIES, LLC dba FATHOM has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

**FIRST CAUSE OF ACTION**
**Failure to Apply for NDPES Coverage under the General Permit**
**Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

89.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

90.     The General Permit contains, in Attachment A, a list of Standard Industrial Classification (SIC) Codes which indicate the types of facilities which must apply for coverage under the General Permit.

91.     Defendant's facility SIC Codes (reflecting its primary operations) establish that it is engaged in manufacturing and machining of precision plastic and metal parts producing custom-designed machine parts. EDEN is informed and believes that Defendant FATHOM uses several different types of materials in its manufacturing processes, including stainless steel, cooper, brass, aluminum, titanium, foam, polypropylene, acrylonitrile butadiene styrene ("ABS"), polyacetal ("POM"), Polycarbonates ("PC") and Nylon. EDEN alleges that Defendant's standard industrial classification ("SIC") Codes are 3089 and 3499 which includes those industries that must apply for General Permit coverage.

92.     Defendant has operated without General Permit coverage at the Facility since at least the beginning of the Facility' operations.

93.     Defendant has failed to date to apply for General Permit coverage for its Facility.

94.     Each day since at least at least the beginning of the Facility's operations, that Defendant has failed to apply for General Permit coverage in violation of the General Permit is a separate and distinct violation of the General Permit against all Defendants. Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants.  General Permit § XXI.A; 33 U.S.C. § 1342.

**SECOND CAUSE OF ACTION**
**Failure to Develop a Storm Water Pollution Prevention Plan and Site Map**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

95.     EDEN re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

96.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement a SWPPP and Site Map.

97.     As outlined herein, Defendant has failed to develop and implement any SWPPP or Site Map for the Facility.

98.     Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop a SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

**THIRD CAUSE OF ACTION**
**Failure to Develop a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

99.     EDEN re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

100.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

101.    As outlined herein, Defendant has failed to develop and implement a monitoring and reporting program for its Facility.

102.    Defendant ongoing failure to develop and implement a monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

103.    Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

104.     Noncompliance with the General Permit constitutes a violation of the CWA

against the Defendant. General Permit § XXI.A; 33 U.S.C. § 1342.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

105.     EDEN re-alleges and incorporates all the preceding paragraphs as if fully set forth

herein.

106.     The General Permit's SWPPP requirements and Effluent Limitation Section V(A)

of the General Permit require dischargers to reduce or prevent pollutants in their storm water

discharges through implementation of BAT for toxic and nonconventional pollutants and BCT

for conventional pollutants.

107.     Defendant has failed to implement BAT and BCT at the Facility for pollutants of

pH affected substances, Total Suspended Solids ("TSS") and Oil & Grease ("O&G"), and other

potentially un-monitored pollutants, in violation of Effluent Limitation Section V(A) of the

General Permit.

108.     Each day since at least the beginning of the Facility's operations, that Defendant

has failed to develop and implement BAT and BCT in violation of the General Permit is a

separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. §

1311(a).

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

109.     EDEN re-alleges and incorporates all of the preceding paragraphs as if fully set

forth herein.

110.     Discharge Prohibition Section III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Section VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

111.     EDEN is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendant has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the General Permit.

112.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with the pollutants of pH affected substances, Total Suspended Solids ("TSS") and Oil & Grease ("O&G") and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into San Francisco Bay.

113.     EDEN is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

114.      EDEN is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

115.      Every day since at least the beginning of Facility's operations, that Defendant has discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## SIXTH CAUSE OF ACTION
### Failure to Properly Train Facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

116.      EDEN re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

117.      Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

118.      Section X.H.f of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

119.     Since at least the beginning of Facility's operations, Defendant has failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

## ELEVENTH CAUSE OF ACTION
### (Recovery Under the Catalyst Theory CCP §1021.5)

120.     EDEN re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

121.     Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs. *Graham v. DaimlerChrysler Corp*., 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal.Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

122.     A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendants prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit "A" and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").)

123.     In the event Defendant alleges the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

124.     Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.      Declare Defendants to have violated and to be in violation of the CWA;

2.      Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.      Enjoin Defendants from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs, or in the alternative and if permitted by the Regional Water Board, order Defendant to obtain a No Exposure Certification permit coverage forthwith;

4.      Order Defendant to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.      Order Defendant to take appropriate actions to restore the quality of United States waters impaired by its activities at the Facility;

6.      Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendants undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.


Dated:  December 18, 2020                Respectfully,



                                         By:  _/s/ Craig A. Brandt_____
                                             Craig A. Brandt
                                             Attorney for Plaintiff